# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| United States of America ) | |
| v. ) | |
| Christian Dunbar ) | Case No. |
| ) | 20-mj-1586 |
| ) | |
| ) | |
| ) | |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of approximately 2006 through 2016 in the county of Delaware and Philadelphia in the Eastern District of Pennsylvania, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 656 | Embezzlement by a Bank Employee |
| 18 U.S.C. Section 371 | Conspiracy to Commit Marriage Fraud |
| 18 U.S.C. Section 1425(b) | Fraudulent Procurement of Citizenship |
| 18 U.S.C. Section 2 | Aiding and Abetting |

This criminal complaint is based on these facts:

See attached Affidavit

☐ Continued on the attached sheet.

/s Robert McManigal
*Complainant's signature*

Robert McManigal, SA, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 09/25/2020

/s Judge Marilyn Heffley
*Judge's signature*

City and state: Philadelphia, PA

U.S. Magistrate Judge Marilyn Heffley
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A COMPLAINT AND WARRANT

I, Robert McManigal, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a complaint and arrest warrant for CHRISTIAN DUNBAR.

2. I have been a Special Agent with the FBI assigned to the Philadelphia Public Corruption Squad since August 2014. From January 2011 to 2014, before I became an agent, I was an Intelligence Analyst in the Public Corruption Unit in Philadelphia. My responsibilities as a Special Agent include the investigation of violations of federal law. In the Public Corruption Unit, I worked on multiple criminal investigations and have collaborated with other experienced federal agents who have participated in hundreds of criminal investigations.

3. The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 656, (Embezzlement by a Bank Employee) have been committed by CHRISTIAN DUNBAR. There is also probable cause to believe that violations of Title 18, United States Code, Section 371 (Conspiracy to Commit Marriage Fraud);[1] Title 18, United States Code, Section 1425(b)

---

[1] Marriage fraud is a violation of 8 U.S.C. § 1325(c).

(Fraudulent Procurement of Citizenship); and Title 18, United States Code, Section 2 (Aiding and Abetting), have been committed by CHRISTIAN DUNBAR ("DUNBAR"). DUNBAR committed some of these offenses with others, including F.N.D., Person #1, and Person #2.

## FACTS ESTABLISHING PROBABLE CAUSE

The following facts establish probable cause to believe DUNBAR, along with others, engaged in the above offenses.

## BACKGROUND

5.  DUNBAR is a naturalized citizen of the United States. According to his internet social networking account on LinkedIn, DUNBAR was a financial advisor with Wells Fargo from May 2011 to January 2016 and attended Temple University from 2000 to 2004.

## EMBEZZLEMENT SCHEME

6.  While at Wells Fargo, DUNBAR worked at the branch located at 3515 West Chester Pike, Newtown Square, PA, 19073. On February 16, 2016, a Wells Fargo internal investigation was commenced after Victim #1 filed a complaint that $10,000 was missing from Victim #1's business account. Victim #1 claimed that, on December 28, 2015, and on January 7, 2016, Victim #1 went to the Newtown Square branch and met with DUNBAR each time in order to transfer $5,000 between accounts. On each date, DUNBAR directed Victim #1 to sign several documents, including a blank withdrawal slip. Unbeknownst to Victim #1, the withdrawal slips were each subsequently completed and processed for $5,000. When Victim #1 realized from bank statements that the withdrawals were processed without his authorization, he complained to the bank. Victim #1 advised that he did not request nor receive any cash on either date.

2

7. On February 17, 2016, Victim #2, separate and unrelated to Victim #1, filed a complaint with Wells Fargo that $5,000 was missing from Victim #2's account. Victim #2 claimed that on December 17, 2015, while closing several time deposit (certificate of deposit or "CD") accounts and transferring the proceeds into other accounts, DUNBAR directed Victim #2 to sign several documents, including a blank withdrawal slip. Unbeknownst to Victim #2, the withdrawal slip was subsequently completed and processed for $5,000. When Victim #2 realized from bank statements that the withdrawal was processed without her authorization, she complained to the bank. Victim #2 advised that she never requested nor received this cash.

8. DUNBAR ended his employment at Wells Fargo on January 21, 2016, prior to the complaints filed by Victim #1 and Victim #2. His last full year salary at Wells Fargo was approximately $61,121. Around that time in January 2016, DUNBAR was appointed as Deputy Treasurer of the City of Philadelphia. His starting salary with the City of Philadelphia was $95,000. Since 2019, he has served as the Treasurer of the City of Philadelphia.

9. On March 14, 2016, Wells Fargo Internal Investigations telephonically interviewed DUNBAR. DUNBAR denied taking the missing money and claimed that he provided it to both customers for each of their transactions. As a result of their internal investigation, Wells Fargo concluded that DUNBAR had engaged in suspected embezzlement and was not eligible for rehire.

10. FBI Special Agents (hereinafter Agents) interviewed Victim #1 and Victim #2 and reviewed documentation related to the transactions in question. Agents reviewed the completed withdrawal slips for the transactions on December 17, 2015; December 28, 2015; and January 7, 2016. Both Victim #1 and Victim #2 stated that DUNBAR directed them to sign blank

withdrawal slips. After a review of each of the processed withdrawal slips for the three separate transactions, Agents noted the "$5,000," and "five thousand" written on each of the withdrawal slips appeared to be the same handwriting. The only common individual involved in all three transactions was DUNBAR, thus substantiating the victims' allegations that DUNBAR had them sign blank withdrawal slips.

11.  Agents reviewed security photographs from Wells Fargo and reviewed Wells Fargo Teller Cash Journal Reports for December 17, 2015; December 28, 2015; and January 7, 2016, as well as subpoenaed bank records from Bank of America account ending in #7088 belonging to DUNBAR.

12.  For the transaction on December 17, 2015, Wells Fargo security footage showed DUNBAR at the teller window during the transaction. The teller cash journal report noted $5,000 was withdrawn in denominations of $100 (quantity of 50). A review of DUNBAR's Bank of America account ending in #7088 showed a cash deposit on December 18, 2015 for $2,600. A review of the subpoenaed Bank of America ATM Transaction report for account #7088 showed the $2,600 deposit consisted of twenty-six (26) $100 bills. There was also a cash deposit into account #7088 on December 22, 2015 for $1,800. A review of the subpoenaed Bank of America ATM Transaction report for account #7088 show the $1,800 deposit consisted of eighteen (18) $100 bills.

13.  For the transaction on December 28, 2015, Wells Fargo security footage also showed DUNBAR at the teller window during the transaction. The teller cash journal report noted $5,000 was withdrawn in denominations of $100 (quantity of 40) and denominations of $20 (quantity of 50). A review of DUNBAR's Bank of America account ending in #7088

4

showed a cash deposit on December 28, 2015 for $3,600.  A review of the subpoenaed Bank of America ATM Transaction report for account #7088 showed the $3,600 deposit consisted of thirty-six (36) $100 bills. The deposit into DUNBAR's account occurred approximately four hours after the cash withdrawal described above.

14. For the transaction on January 7, 2016, Wells Fargo security footage again showed DUNBAR at the teller window during the transaction.  The teller cash journal report noted $5,000 was withdrawn in denominations of $100 (quantity of 50).  A review of DUNBAR's Bank of America account ending in #7088 showed a cash deposit on January 13, 2016 for $600. A review of the subpoenaed Bank of America ATM Transaction report for account #7088 showed the $600 deposit was made up of six (6) $100 bills.

15. Agents reviewed DUNBAR's statements for account #7088 six months before and six months after the above cash deposits.  During the six months before and after, not including the cash deposits detailed above, there was a total of approximately $450 in cash deposits into account #7088.

## MARRIAGE FRAUD SCHEME

16. DUNBAR was born in Liberia on September 21, 1980. He became a permanent resident of the United States on October 10, 2012 and he became a naturalized citizen on January 8, 2016.  As previously mentioned, he attended Temple University from 2000 to 2004.

17. F.N.D. was born in Senegal on May 1, 1982.  She became a permanent resident of the United States on May 23, 2007 and became a naturalized citizen on August 6, 2012. According to a Temple University yearbook, F.N.D. was a senior in 2006.

18. Person #1 is a United States citizen by birth. According to Person #1's public profile on LinkedIn, Person #1 attended Temple University from 2000 to 2004, *i.e.*, the same years that DUNBAR attended Temple University.

19. Person #2 is a United States citizen by birth. According to a 2004 Temple University football team roster, Person #2 was a member of the team. Both Person #2 and DUNBAR were seniors on the 2004 roster.

20. Based on the investigation to date, there is probable cause to believe DUNBAR participated in a conspiracy to commit marriage fraud and that he and F.N.D. entered into fraudulent marriages with Person #1 and Person #2, respectively, in order to obtain U.S. citizenship.

21. On November 6, 2006, DUNBAR and Person #1 filed an application for a marriage license from the City of Philadelphia. One day later, on November 7, 2006, F.N.D. and Person #2 filed an application for a marriage license from the City of Philadelphia. According to their marriage certificates, filed with the City of Philadelphia, F.N.D. and Person #2 were married on December 12, 2006 and DUNBAR and Person #1 were married on December 17, 2006. The officiant was the same for both of their weddings, that being a professor who formerly taught at Temple University. The close timing of the issuance of the marriage certificates and marriage ceremonies, the fact that they were students at Temple University at the same time, and the use of the same official to solemnize the marriages suggests there was coordination among the parties.

22. Pursuant to the Immigration and Nationality Act ("INA"), some aliens or non-citizens of the United States, were eligible to adjust their status to that of lawful permanent

residents ("LPRs"). The United States Department of Homeland Security, Citizenship and Immigration Services (USCIS) adjudicated immigration petitions and applications filed in the United States. Aliens admitted to the United States were eligible to adjust to LPR status through a bona fide marriage to a United States citizen and an approvable petition from that United States citizen spouse. The United States citizen spouse must establish a bona fide relationship between the United States citizen petitioner and the alien beneficiary, and demonstrate that the marriage was not entered into for immigration purposes. LPRs are then eligible to apply for United States citizenship three or five years later. DUNBAR was admitted to the United States on January 3, 1988 as a B-2 non-immigrant, temporary tourist visa. DUNBAR's non-immigrant status expired six months later and he remained unlawfully in the United States. In around 2005, DUNBAR, a native and citizen of Liberia, was granted Temporary Protected Status (TPS) in the United States. TPS allows aliens to remain in the United States temporarily but did not confer legal permanent residence. DUNBAR was eligible to adjust his status to that of a LPR upon entering into a bona fide marriage with a United States citizen. Person #1, a United States citizen, filed Form I-130, Petition for Alien Relative, on February 27, 2009, claiming DUNBAR, the alien beneficiary, as an immediate relative spouse. The alien, DUNBAR, filed Form I-485 to adjust his immigration status to that of a LPR. The I-130, alleging the bona fides of the marriage, and DUNBAR's I-485, demonstrating his admissibility to the United States, were both approved by USCIS on October 10, 2012. On December 19, 2015, DUNBAR's Form N-400, Application for Naturalization, was approved by USCIS and he was subsequently sworn in as a naturalized citizen of the United States on January 8, 2016. DUNBAR's marriage to Person #1 provided him with the basis to obtain his legal permanent residence and then his United States citizenship. DUNBAR was

7

granted a divorce from Person #1 on March 13, 2017, approximately 14 months after he obtained United States citizenship.

23.     F.N.D. was granted permanent residency and subsequently became a naturalized citizen of the United States based, at least in part, on her marriage to Person #2. Agents have been unable to determine whether F.N.D. and Person #2 remain married under Pennsylvania law.

24.     Travel records, Facebook records, and wedding registry records indicate that DUNBAR and F.N.D. were married to each other on June 8, 2013 in Senegal. DUNBAR and F.N.D. have known each other since at least November 2004. An article from The Temple News, authored by T.C. Mazar and published on November 16, 2004, regarding a dance team at Temple University, reported that F.N.D. was the team's president and DUNBAR was the team's vice president. An article dated June 22, 2020, published on the website www.medium.com, reported DUNBAR met F.N.D. while at college and quoted him as saying, "I knew I'd ask my wife to marry me within a day of meeting her, but it took me a few years to convince her of that."

25.     In 2015, DUNBAR filed an Application for Naturalization (Form N-400) with USCIS. The form was signed and dated by DUNBAR on July 7, 2015. By signing, DUNBAR certified under penalty of perjury under the laws of the United States of America that the application, and the evidence submitted with it, was true and correct. DUNBAR's application was approved on December 19, 2015. In the application, DUNBAR reported that he resided at xxx Bainbridge Street in Philadelphia, PA from December 12, 2011 to the date the application was submitted, and he resided at 510 Washington Street in Philadelphia, PA from January 1,

2007 to December 14, 2011. DUNBAR reported that he was married to Person #1 and listed xxx Bainbridge Street as her home address. On October 21, 2015, during his pre-naturalization interview, DUNBAR again affirmed under penalty of perjury that the information in the Form N-400, including his residence information, marital status and spouse's address was correct. Lastly, on January 8, 2016, the day DUNBAR received his U.S. citizenship, DUNBAR certified that his marital status had not changed since his October 21, 2015 interview, and reported his address as xxx Bainbridge, Philadelphia, PA. He further certified that, since his interview, he did not commit any crime or offense for which he had not been arrested (thus ignoring the embezzlement of funds at Wells Fargo just weeks earlier), that he had not practiced polygamy and that he had not given false testimony to obtain immigration benefits.

26. Evidence suggests for at least a portion of the time period covered by DUNBAR's application, he did not live with Person #1 but was, in fact, living with and was married to F.N.D. Check number 137 from Wells Fargo Checking account ending in 9416, an account in the name of F.N.D., was obtained via a grand jury subpoena. The check is dated January 29, 2015 and bears the names CHRISTIAN S. DUNBAR and F.N.D. The address on the check is 45xx Sansom Street, Philadelphia, PA. This check was made payable to F.N.D. Similarly, check number 1092, dated July 8, 2015, from Bank of America checking account ending in 7088, also obtained via a grand jury subpoena, bears the name CHRISTIAN DUNBAR and has 49xx Sansom Street, Philadelphia, PA listed as DUNBAR's address. This check is made payable to F.N.D. Your Affiant has reason to believe that DUNBAR and/or F.N.D. used each of these addresses – 45xx Sansom Street and 49xx Sansom Street - at some point.

27. DUNBAR provided to USCIS a 2008 Form W-2 Wage and Tax Statement (from his employment at a company called eModa.com Group), which listed his address as 49xx Sansom Street. This address was the same address F.N.D. used on her immigration application. As stated above, DUNBAR never reported he resided at 49xx Sansom Street to USCIS. However, in the home address block on Form I-693, Report of Medical Examination and Vaccination Record, DUNBAR hand wrote "49xx SA" which was crossed out and replaced with xxx Washington Ave. DUNBAR's signature on the Form I-693 was dated August 19, 2011.

28. A review of Pennsylvania Department of Transportation (PennDOT) driver's license records support the belief that DUNBAR did not report his true address, which he shared with F.N.D., but instead reported that he lived with Person #1 to USCIS in order to fraudulently obtain citizenship. As stated previously, DUNBAR did not report 49xx Sansom Street as a residence on any of the forms he submitted to USCIS. However, beginning at least as early as July 18, 2006, DUNBAR used 49xx Sansom Street as his residence address for his Pennsylvania Driver's license. On that date, DUNBAR was issued a license with the address 49xx Sansom Street. Between July 18, 2006 and January 10, 2012, DUNBAR renewed his driver's license on three occasions and requested a duplicate driver's license one time. DUNBAR did not request a change of address with any of these submissions. On January 10, 2012, DUNBAR was issued a new driver's license with the address xxx Bainbridge Street. This is the same address utilized by DUNBAR and Person #1 on DUNBAR's Application to Register Permanent Residence or Adjust Status, Form I-485, filed with USCIS on February 6, 2012 and Form I-864, Affidavit of Support under Section 213A of the Act completed by Person

#1. DUNBAR was granted permanent residency October 10, 2012. On April 5, 2013, approximately seven months after DUNBAR received his permanent residency, he changed the address on his driver's license back to 49xx Sansom Street.

29. DUNBAR, while employed at Wells Fargo Bank from June 30, 2011 to January 21, 2016, listed his spouse as F.N.D. on personnel paperwork. According to records obtained from Wells Fargo Bank, DUNBAR listed F.N.D. as his emergency contact, dependent, and spouse. The records also reflected F.N.D. was at the same address as DUNBAR, 45xx Sansom Street. The date DUNBAR made F.N.D. his emergency contact or dependent has not been determined.

30. On DUNBAR's N-400 application, he listed that his daughter was born on September 13, 2014. A review of subpoenaed medical records from Pennsylvania Department of Vital Records and the Hospital of the University of Pennsylvania showed that DUNBAR and F.N.D. were the parents of the child. F.N.D, completed paperwork that stated she was married, married to the father of the baby, and the father of the baby was DUNBAR. The paternity paperwork was completed before DUNBAR signed and submitted his N-400 application on July 7, 2015 and before he was interviewed by USCIS as part of his naturalization interview on October 21, 2015.

31. Agents obtained divorce records from the City of Philadelphia Court of Common Pleas. DUNBAR, as the affiant, filed an affidavit on March 31, 2016 with the Court that stated the parties (DUNBAR and Person #1) were separated on December 1, 2011, and have continued to live separate and apart for a period of at least one year. The affidavit was filed two months after DUNBAR was a naturalized citizen as a result of his marriage to Person

#1. The separation date of December 1, 2011 contradicts DUNBAR's N-445 Notice of Naturalization Oath Ceremony and Form N-400 Application for Naturalization, where he stated that he had not been separated.

32. On June 8, 2020, DUNBAR's mother posted on the internet social networking platform Facebook, a photograph of DUNBAR and F.N.D, with the following text, "Happy anniversary to Mr. and Mrs. CHRISTIAN DUNBAR." Based on significant other evidence, both included and not included in this affidavit, a federal search warrant was executed on Facebook, Inc. on August 25, 2020 for content related to F.N.D.'s account.

33. Based on a review of that return, Agents reviewed photographs of DUNBAR and F.N.D, together as far back as 2006. Photographs of their apparent wedding in Senegal were also observed. On June 8, 2020, a private message between F.N.D, and another individual was reviewed. The content of the message from F.N.D. stated, "celebrating 7 years of wedding and 17 years together." Further, in June and September 2017, F.N.D. communicated with Person #2 through Facebook Messenger. Person #2, in an effort to obtain "funds" from the State of New Jersey, requested that F.N.D. send him identifications and the "wedding certificate." F.N.D. agreed to send the items and further wrote, "we miss uuuu" and we are "expecting baby #2."

## CONCLUSION

34. I believe the aforementioned facts establish probable cause that in the Eastern District of Pennsylvania, CHRISTIAN DUNBAR has committed multiple federal crimes, including but not limited to violations of: Title 18, United States Code, Section 656 (Embezzlement by a Bank Employee); Title 18, United States Code, Section 371 (Conspiracy to Commit Marriage Fraud); Title 18, United States Code, Section 1425(b) (Fraudulent

Procurement of Citizenship); and Title 18, United States Code, Section 2 (Aiding and Abetting). Accordingly, I respectfully request the issuance of an arrest warrant for CHRISTIAN DUNBAR.

35. I also respectfully request that the Court issue an Order pursuant to which the Application and Affidavit for the arrest warrant, and all related papers, be filed under seal. The information contained in these materials is relevant to an ongoing investigation and premature disclosure of the Application and Affidavit for the arrest warrant and related papers would substantially jeopardize the effectiveness of the investigation.

Respectfully submitted,

/s Robert MacManigal
Robert McManigal
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on
September 25, 2020.

/s Judge Marilyn Heffley
HONORABLE MARILYN HEFFLEY
United States Magistrate Judge